IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| LILI GENG, M.D., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UT MEDICAL GROUP, INC. d/b/a )<br>UNIVERSITY CLINICAL HEALTH, )<br>)<br>Defendant. ) | Case No. 2:20-cv-02818-JPM-cgc |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO ENFORCE SETTLEMENT**

Before the Court is Defendant UT Medical Group, Inc. d/b/a University Clinical Health's ("UCH") Motion to Enforce Settlement, filed on November 10, 2021. (ECF No. 68.) Plaintiff Lili Geng, M.D. ("Dr. Geng") filed a Response to Defendant's Motion to Enforce Settlement on November 24, 2021. (ECF No. 70.) Defendant filed a Reply on December 6, 2021. (ECF No. 71.)

For the reasons set forth below, Defendant's Motion to Enforce Settlement is **GRANTED** with respect to all settlement provisions except the release of ADEA claims. Defendant's request for attorney fees and expenses is **DENIED**.

**I.    BACKGROUND**

This action arises out of Dr. Geng's Title VII suit against UCH for discrimination based on sex, race, and national origin and retaliation. (Compl., ECF No. 1 ¶ 6–7.) Depositions, including Plaintiff's deposition, in the case were scheduled to begin on September 8, 2021. (ECF No. 68 at PageID 209; ECF No. 70 at PageID 228 (citing Geng Decl., ECF No. 70-1 ¶

3).)  Plaintiff's deposition was scheduled to be taken on September 8, 2021.  (ECF No. 70 at PageID 228.) (citing Geng Decl., ECF No. 70-1 ¶ 3.)  The Parties engaged in settlement negotiations on September 7, 2021, during which Plaintiff was physically present with her then-counsel, Tressa Johnson ("Ms. Johnson") and Kristy Bennett ("Ms. Bennett").  (ECF No. 68 at PageID 209.) (citing Dowdy Decl., ECF No. 68-1 ¶ 4.)  (See also Dowdy Decl., ECF No. 68-1 ¶ 4 ("During the settlement negotiations, I was told by Ms. Johnson that Dr. Geng was physically present in her office[.]").)  Plaintiff asserts, however, "While it is true that the Plaintiff was physically present in her attorney's office that day . . ., she did not participate in or hear the conversations between her attorney and defense counsel," as she "was waiting in the conference room of her attorneys' office" during the discussions.  (ECF No. 70 at PageID 228–29.)

On September 7, 2021, Defense counsel submitted Defendant's final settlement offer by text message, and Plaintiff's then-counsel accepted the offer on Plaintiff's behalf, via text message and a subsequent phone call.  (ECF No. 68 at PageID 209.) (citing Dowdy Aff. Exh. 1, ECF No. 68-1 at PageID 221–22.)  The same day, Defense counsel drafted a document entitled Binding Settlement Term Sheet (the "Term Sheet").  (Id.) (citing Dowdy Decl., ECF No. 68-1 ¶ 8; Binding Settlement Term Sheet, ECF No. 68-2 at PageID 224–25.)

Plaintiff contends that, on September 8, 2021, when Plaintiff was driving back from the settlement discussions in Tennessee to her workplace in Ohio, her attorney told her by phone that she had emailed Plaintiff a document entitled Binding Settlement Term Sheet and "called her three times that day about signing the agreement and [told] her in her last call that she must sign the document that day."  (ECF No. 70 at PageID 229.) (citing Geng Decl., ECF No. 70-1 ¶ 5.)  At Plaintiff's request, Plaintiff's attorney revised the non-disparagement clause to be

mutual.  (Id.) (citing Geng Decl., ECF No. 70-1 ¶ 6.) (See also ECF No. 68-2 at PageID 224.) Plaintiff contends that she "also specifically asked her attorney . . . for assurances that the agreement only settled her discrimination claims and that she would still be able to pursue a remedy for the forgery of her signature on a patient record" that led to her termination, "which she believed was in retaliation for her prior protests of discriminatory treatment."  (Id.) (See also Geng Decl., ECF No 70-1 ¶ 6.)  Plaintiff asserts that she reviewed and electronically signed the document after her counsel "assured [her that] she could still pursue that claim."  (Id.) (citing Geng Decl., ECF No 70-1 ¶ 7.)  The Term Sheet has thus been signed by both Parties and was purportedly effective as of September 7, 2021.[1]

The Term Sheet as signed states, "Following execution of this Settlement Term Sheet, the parties shall proceed with the preparation and execution of a Settlement Agreement and other definitive documents consistent with the terms of this Settlement Term Sheet, which are binding on the parties."  (ECF No. 68-2 at PageID 224.)  The Term Sheet further provides:

> Although the parties must prepare and execute a final Settlement Agreement and other definitive documents that are consistent with the terms of this Settlement Term Sheet, the essential terms of this Settlement Term Sheet . . . constitute a binding agreement and understanding between the parties with respect to the subject matter hereof and supersede all prior agreements and understandings relating to the subject matter hereof . . . .

(Id. at PageID 225.)  Finally, in addition to the mutual non-disparagement provision discussed above, the Term Sheet also provides, inter alia, "The Parties will execute a Confidential Release and Settlement Agreement that includes <u>a full release of all claims</u>, confidentiality, nondisparagement, and other applicable provisions."  (Id. at PageID 224.) (emphasis added.)

---

[1] The Term Sheet states that it was "AGREED AND ENTERED THIS 7th DAY of September, 2021."  (ECF No. 68-2 at PageID 225.)  Plaintiff and her former and current counsel, however, have stated that Plaintiff signed and returned to Defendant the Term Sheet on September 8, 2021.  (See ECF No. 76-1; ECF No. 70 at PageID 229; Geng Decl., ECF No. 70-1 ¶ 7.)

On September 13, 2021, Defendant filed a Notice of Settlement with the Court. (ECF No. 59.)  Therein, Defendant stated: "[A]ll of Plaintiff's claims against Defendant have been resolved through confidential settlement. . . . [U]pon completion [of the conditions of settlement], the Parties will file a Joint Stipulation of Dismissal with Prejudice . . . ." (Id. at PageID 190.)

Also on September 13, 2021, Defense counsel emailed a draft of the Confidential Release and Settlement Agreement ("the Agreement") to Ms. Johnson and Ms. Bennett. (ECF No. 68 at PageID 210.) (citing Dowdy Decl., ECF No. 68-1 ¶ 10.)  Between that date and September 29, 2021, Ms. Johnson requested revisions to the Agreement. (Id.) (citing Dowdy Decl., ECF No. 68-1 ¶ 11.)  Like the Term Sheet, the Agreement contains a claims-release provision, which provides in relevant part:

> **Release**.  Plaintiff releases and forever discharges Defendant and its respective affiliates, officers, directors, members, employees, contractors . . . [and] agents . . . from any and all claims, demands, obligations, or liabilities for injuries, death, losses and damages, whether personal, property, or economic, whether now known or unknown, including but not limited to those that were or could have been asserted in the Civil Action and [anti-discrimination statutes, other employment laws, [and] tort and contract claims].

(ECF No. 70-2 at PageID 244–45.)  Additionally, paragraph 9 provides, "**Review Period**. Plaintiff acknowledges and understands that Plaintiff has a period of twenty-one (21) days to consider this Agreement, although Plaintiff need not take that long." (Id. at PageID 246.) Paragraph 10 further provides:

> **Voluntary Execution**.  Plaintiff is advised and encouraged to consult with an attorney of Plaintiff's choice before signing this Agreement.  Plaintiff also acknowledges that Plaintiff has carefully read this Agreement in its entirety; that Plaintiff has had an adequate opportunity to consider it; that Plaintiff understands its terms; that Plaintiff voluntarily assents to all terms and conditions contained in this Agreement; that Plaintiff is signing it voluntarily and of Plaintiff's own free will; and that Plaintiff is not suffering from any disability or condition that would render Plaintiff unable to understand, comprehend, or otherwise enter into this Agreement.

(Id.)

On October 5, 2021, Ms. Johnson and Ms. Bennett called Defense counsel and "informed them that Dr. Geng was refusing to sign the Settlement Agreement." (Id. at PageID 210–11.) (citing Dowdy Decl., ECF No. 68-1 ¶ 12.) On October 6, 2021, Ms. Bennett informed the Court via email that Plaintiff, "against legal advice," had informed her counsel that she no longer wished to settle and was seeking to withdraw the settlement; Plaintiff's counsel were seeking to withdraw from representation "due to irreconcilable differences and a lack of communication" with Plaintiff. (ECF No. 76-1.) During a Video Status/Scheduling Conference on November 2, 2021, the Court granted Plaintiff's Motion to Substitute Counsel of Record (see ECF No. 63), and Mr. Dan Norwood was officially substituted for Ms. Bennett and Ms. Johnson as Plaintiff's counsel. (ECF No. 64.)

On November 10, 2021, Defendant filed the instant Motion to Enforce Settlement. (ECF No. 68.) On November 24, 2021, Plaintiff filed a Response. (ECF No. 70.) Defendant filed a Reply on December 6, 2021. (ECF No. 71.) On December 20, 2021, the Court held a Video Motion Hearing on Defendant's Motion to Enforce Settlement. (ECF No. 75.)

## II. LEGAL STANDARD

The Sixth Circuit "has long recognized the broad, inherent authority and equitable power of a district court to enforce an agreement in settlement of litigation pending before it." Therma-Scan, Inc. v. Thermoscan, Inc., 217 F.3d 414, 419 (6th Cir. 2000) (quoting Bostick Foundry Co. v. Lindberg, 797 F.2d 280, 282–83 (6th Cir. 1986)). "The district court's power to summarily enforce settlements extends to cases where the parties' agreements are not in writing and even to those settlement agreements made off the record, not in the presence of the court." Bowman v. Assurance Co. of Am., No. 3:07-cv-388, 2009 WL 311112, at *1 (E.D.

...
...

Tenn. Feb. 6, 2009) (quoting Henley v. Cuyahoga Cnty Bd. of Mental Retardation & Dev. Disabilities, 141 F. App'x 437, 442 (6th Cir. 2005)). "Public policy favors settling cases without litigation, and settlement agreements should be upheld whenever it is equitable to do so." Graley v. Yellow Freight Sys., Inc., No. 98-4166, 2000 WL 799779, at *4 (6th Cir. June 14, 2000) (citing Aro Corp. v. Allied Witan Co., 531 F.2d 1368, 1372 (6th Cir. 1976), cert. denied 429 U.S. 862 (1976)). Thus, "[b]efore enforcing a settlement agreement, . . . a district court must conclude that the parties have reached an agreement on all material terms." Bobonik v. Medina Gen. Hosp., 126 F. App'x 270, 273 (6th Cir. 2005) (citing Brock v. Scheuner Corp., 841 F.2d 151, 154 (6th Cir. 1988)). "Summary enforcement of a settlement agreement has been deemed appropriate where no substantial dispute exists regarding the entry into and terms of an agreement." Lovell v. Children's Corner Daycare, No. 1:17-cv-01039-JDT-egb, 2018 WL 1476096, at *2 (W.D. Tenn. Jan. 23, 2018) (citing Kukla v. Nat'l Distillers Prods. Co., 483 F.2d 619, 621 (6th Cir. 1973)). See also RE/MAX Intern, Inc. v. Realty One, Inc., 271 F.3d 633, 646 (6th Cir. 2001).

### III.   ANALYSIS

The Court first addresses whether it will enforce settlement between the Parties and then discusses Defendant's request for attorney fees and expenses.

> A. *The Court Will Enforce the Settlement Except as to the Release of ADEA/OWBPA Claims*
>
> > i.   The Parties Agreed on All the Material Terms of the Settlement

In order to enforce settlement between the Parties, the Court must find that Plaintiff and Defendant "reached an agreement on all material terms" of the settlement. Bobonik, 126 F. App'x at 273 (citing Brock, 841 F.2d at 154). Although Plaintiff contends that her signing of

6

the Term Sheet in general "was not a 'voluntary execution'" (discussed further below), the only provision with which she specifically takes issue and claims she did not "understand" is the release-of-claims provision.  (ECF No. 70 at PageID 230–31.)  "A release-of-claims provision is a material term of a settlement agreement."  Hemlock Semiconductor, L.L.C. v. Summit Process Design Inc., No. 3:15-cv-664, 2016 WL 2595163, at *4 (M.D. Tenn. May 5, 2016) (citing Mich. Reg'l Council of Carpenters v. New Century Bancorp, 99 F. App'x 15, 21 (6th Cir. 2004)).  Plaintiff does not argue that there was any change to the material terms of the final Agreement versus those of the Term Sheet.  (See ECF No. 70 at PageID 230–33.)  Thus, if Plaintiff agreed to the material terms of the Term Sheet, she also agreed to the material terms of the Agreement.

"Because settlement agreements are a type of contract, the formation and enforceability of a purported settlement agreement are governed by state contract law."  Smith v. ABN AMROO Mortg Grp. Inc., 434 F. App'x 454, 460 (6th Cir. 2011) (citation omitted).  "Mutuality of assent [to a settlement contract] should be determined from the 'parties' manifestations according to an objective standard.'"  Hemlock Semiconductor L.L.C., 2016 WL 2595163 at *3 (quoting Moody Realty Co., Inc. v. Heustis, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007)).  To "glean the parties' intent," a court "should consider 'the situation, acts, and conduct of the parties, and the attendant circumstances.'"  Id. (quoting Scandlyn v. McDill Columbus Corp., 895 S.W.2d 342, 345 (Tenn. Ct. App. 1994)).

Defendant asserts that "there was a mutual agreement on all material terms relating to the settlement here" because both Parties signed the Term Sheet as well as negotiated and agreed to the terms of the settlement.  (ECF No. 68 at PageID 212.)  Defendant further asserts that, "Plaintiff, a sophisticated physician, presumably participated in the settlement negotiations

7

while she was in person at the office of her attorneys as the negotiations were taking place. At the time that Plaintiff signed the Settlement Term Sheet, she agreed to all of the negotiated terms, and the mere fact that she has since changed her mind is irrelevant and simply should not be allowed." (Id.)  Plaintiff responds that "she 'did not participate in or hear the conversations between her attorney and defense counsel.'" (ECF No. 70 at PageID 232) (citing Geng Decl., ECF No. 70-1 ¶ 4.)  Plaintiff further asserts that instead of being "involved in finalizing the settlement agreement, all she did was ask that the non-disparagement clause be made mutual" and that she "understood from her attorney at the time that she was only settling her discrimination claim in the settlement agreement and not her claim involving her forged signature . . . ." (Id.) (citing Geng Decl., ECF No. 70-1 ¶ 6.)  Plaintiff next asserts that just because she is "'a sophisticated physician', that does not mean she was able to understand all of the provisions of the [Term Sheet], particularly when she was pressured to sign it before she was given 'adequate time to consider it' or to 'understand its terms.'" (Id. at PageID 232–33.) (citing Geng Decl., ECF No. 70-1 ¶ 5.)

Plaintiff's "manifestations" of being present with her counsel during settlement discussions, reviewing the Term Sheet, requesting changes, and signing the Term Sheet objectively evinced her assent to the settlement contract, including all its material terms. See Hemlock Semiconductor L.L.C., 2016 WL 2595163 at *3 (quoting Moody Realty Co., Inc. v. Heustis, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007)).  Even if Plaintiff did not hear or participate in the in-office settlement discussions on September 7, 2021, her counsel led Defense counsel to believe that she was present and thus involved in the discussions. (See Dowdy Decl., ECF No. 68-1 ¶ 4.) ("During the settlement negotiations, I was told by Ms. Johnson that Dr. Geng was physically present in her office.")  Moreover, in Graley, the Plaintiff's argument that

"there was no meeting of the minds because he did not directly participate in the [settlement] negotiations, but instead his attorney negotiated and informed him of the terms" was unavailing. 2000 WL 799779 at *7–8.  Instead, the court noted that an opposing party "may justifiably rely on [a plaintiff's] attorney's apparent authority [to settle claims in the matter] unless there is reason to believe that the attorney has no authority to negotiate a settlement." Id. at *7 (citing Capital Dredge & Dock Corp v. City of Detroit, 800 F.2d 525, 530 (6th Cir. 1986)).  Here, even before Plaintiff personally signed the Term Sheet, Plaintiff's then-counsel expressed by text message that a deal had been reached on the terms discussed, including the mutual non-disparagement clause, and Defense counsel would have been justified in relying on this representation even in the absence of Plaintiff's direct participation. (ECF No. 68-1 at PageID 221–22.)  Further, although Plaintiff is not an attorney, she is, as Defendant asserts, a sophisticated professional, who was involved in finalizing the Term Sheet and presumably able to understand an unambiguous release-of-claims provision such as the one at issue.  Overall, the surrounding circumstances and the Parties' conduct, objectively viewed, convince the Court, and would have reasonably convinced Defendant, that Plaintiff assented to the Term Sheet and thus to the material terms of the settlement.

Furthermore, Defendant asserts that "[t]he Sixth Circuit has specifically enforced settlement agreements where one of the parties refused to execute formal settlement documents despite previously agreeing to an outline containing the essential terms of the settlement." (ECF No. 68 at PageID 213.) (citing Graley, 2000 WL 799779, at *1.)  Defendant asserts:

> Here, the Parties have much more than an outline of the settlement terms; Dr. Geng, who was represented at all times by competent counsel of her choosing, signed the Binding Settlement Term Sheet, which outlined the negotiated settlement terms.  Dr. Geng was present with her attorneys during the settlement negotiations and then reviewed and signed the [Term Sheet] voluntarily and with the advice of her previous Counsel. Dowdy Aff., ¶ 4.

9

(ECF No. 68 at PageID 214.)  Plaintiff does not respond to Defendant's discussion of the facts of <u>Graley</u> but instead attempts to distinguish other cases cited by Defendant in which the Court enforced a finalized settlement to which a preliminary version containing the essential terms was formerly agreed.  (ECF No. 70 at PageID 234–35.)

Plaintiff's attempts to distinguish these cases, however, are unavailing.  For example, Plaintiff contends that in <u>Henley</u>, "only after a settlement was entered and the lawsuit dismissed did the Plaintiff seek to have the case reopened and the settlement set aside." (ECF No. 70 at PageID 234.)  In that case, however, the court provided for reinstatement of the case "within sixty (60) days [after entry of its order of dismissal] should the settlement not be concluded," if the plaintiff could establish that finalized settlement documents materially altered the terms of the prior-reached settlement agreement; the court found that the plaintiff could not make such a showing.  <u>Henley</u>, 141 F. App'x at 440–41.  Plaintiff here has likewise not established that the terms of the Agreement were materially different from those of the Term Sheet.  Plaintiff next attempts to distinguish <u>Bowman</u>, asserting that the court enforced the settlement only because one party had already paid money as part of the settlement and the plaintiff "did not even respond to the Motion to Enforce Settlement or an Order to Show Cause why the motion to enforce settlement should not be granted." (ECF No 70 at PageID 235).  Yet, while the plaintiff's failure to respond allowed the court to consider all the facts in the defendant's motion as true, it did not alter the law on which the court relied: that agreement must (and had been) reached on all material terms for the court to enforce the settlement.  <u>Bowman</u>, 2009 WL 311112 at *1–2 (quoting <u>RE/MAX Int'l</u>, 271 F.3d at 645–46).  Here, as in <u>Bowman</u>, agreement was objectively reached on all such terms.

   ii. <u>The Court Cannot Enforce the Release of ADEA/OWBPA Claims</u>

At the Motion Hearing, the Parties discussed the effect of paragraphs 9 and 10 of the Agreement on the binding nature of the Term Sheet, since those provisions appear to provide Plaintiff with an option not to be bound by the Agreement. (See ECF No. 75.) Defendant stated that it could not omit this language from the final Agreement because it is statutorily required under the ADEA. (Id.)

"The Older Workers Benefit Protection Act (OWBPA) imposes specific requirements for releases covering ADEA claims." Oubre v. Entergy Ops., Inc., 522 U.S. 422, 424 (1998). Specifically, waiver must be "knowing and voluntary," which requires "at a minimum" that, inter alia, "the individual is advised in writing to consult with an attorney prior to executing the agreement" and "the individual is given a period of at least 21 days within which to consider the agreement." 29 U.S.C. § 626(f)(1)(E)–(F). If a release "[does] not comply with the OWBPA's stringent safeguards, it is unenforceable against [the employee] insofar as it purports to waive or release her ADEA claim[(s)]." Oubre, 522 U.S. at 427–28. Thus, such a release "cannot bar [the employee's] ADEA [claim], irrespective of the validity of the contract as to other claims." Id. at 428.

Defendant asserted at the Motion Hearing that the statutorily required provisions did not permit Plaintiff to undo the agreement she had already made to relinquish her claims and settle the case. (ECF No. 75.) That is, although the language contemplated questions, clarifications, and changes in wording to the Agreement, it did not contemplate or allow for changes to the essential terms, which had already been agreed to in the Term Sheet. (Id.) Plaintiff responded that if Defendant wanted Plaintiff to have the opportunity for voluntary execution of the settlement, it should have put this language in the Term Sheet. (Id.) Defendant replied that it did not include such language in the Term Sheet, although it was required in the final

Agreement, because the Term Sheet was intended to efficiently establish a meeting of the minds over the settlement. (Id.)

Because the Term Sheet does not comply with the requirements of the OWBPA, the Court cannot enforce it against Plaintiff as a waiver of her claims under the ADEA or OWBPA. Defendant is correct that, ordinarily (as discussed below), such language would not permit Plaintiff to renege on material terms to which she had already assented. As articulated by the Second Circuit, provisions in the settlement agreement that "simply follow the legal preconditions for waiving rights under the ADEA" are not "additional terms subject to negotiation." Powell v. Omnicom, 497 F.3d 124, 130 (2d Cir. 2007). Thus, the absence of these provisions in the Term Sheet does not negate the Parties' agreement on all the material terms of the settlement, including the release of ADEA claims. However, "[t]he statutory command [of the OWBPA] is clear: An employee 'may not waive' an ADEA claim unless the waiver or release satisfies the OWBPA's requirements." Oubre, 522 U.S. at 426–27. While neither Party contends that the Agreement fails to follow OWBPA's safeguards, enforcing a release of claims against Plaintiff as to her ADEA/OWBPA claims (see ECF No. 70-2 at PageID 244) simply because she agreed to release any such claims via the Term Sheet would essentially negate OWBPA's "statutory command."[2] Id.

    iii.    Plaintiff Cannot Make Out a Defense with Respect to the Remainder of the Settlement

"If the parties reached agreement on all material terms, . . . only the existence of fraud or mutual mistake can justify reopening an otherwise valid settlement agreement." Lovell, 2018

---

[2] Plaintiff has not alleged any ADEA claims in this case. (See generally Compl., ECF No. 1.) Thus, because the Court now enforces the remainder of the settlement (as discussed below), a Judgment shall issue closing the case. Plaintiff, however, is free to bring ADEA claims against Defendant, subject to any statutory bar, if such a claim can be articulated.

12

WL 1476096 at *2 (quoting Henley, 141 F. App'x at 443 (further citation omitted)). The party challenging a settlement has the burden of showing it was "invalid based on fraud or mutual mistake." Id. (quoting Henley, 141 F. App'x at 443 (further citation omitted)). "Summary enforcement of a settlement agreement for which there is no dispute as to the terms of the agreement is the only appropriate judicial response, absent proof of fraud or duress." RE/MAX Int'l, Inc., 271 F.3d 633 at 650.

Plaintiff cannot make out any of the three defenses above, namely, mutual mistake, duress, or fraud. First, Plaintiff does not allege anything resembling mutual mistake. (See generally ECF No. 70.) Next, considered in the light most favorable to Plaintiff, her assertion that she felt pressured to settle based on her then-counsel's multiple phone calls and alleged statement that she must sign the Term Sheet that day amounts to an attempt to rely on the defense of duress. (See id. at PageID 229–230; Geng Decl., ECF No. 70-1 ¶ 5, 10.) Finally, also read in the light most favorable to Plaintiff, her contention that she signed off on the claims-release provision of the Term Sheet because her original counsel misinformed her as to the nature of that provision invokes the defense of fraudulent misrepresentation. (See ECF No. 70 at PageID 229; Geng Decl., ECF No. 70-1 ¶ 6–7.) However, the facts fall short of establishing either of these defenses, as discussed below.

"Duress is a condition of the mind produced by improper external pressure or influence that destroys the free will of a person causing him to make a contract not of his volition." Nelson v. McDonough, No. 19-cv-2839-JPM-tmp, 2021 WL 4714663, at *4 (W.D. Tenn. Sept. 10, 2021) (Mag. Judge Tu M. Pham), *adopted by* 2021 WL 4711018 (quoting Trigg v. Trigg, No. E2014-00860-COA-R3-CV, 2015 WL 66544, at *5 (Tenn. Ct. App. 2015) (quoting Gilley v. Gilley, 778 S.W.2d 862, 864 (Tenn. Ct. App. 1989))) (emphasis added). The pressure must 'be

of such severity . . . so as to <u>overcome the mind and will of a person of ordinary firmness</u>.'" Id. (quoting <u>McMahan v. McMahan</u>, No. E2004-03032-COA-R3-CV, 2005 WL 3287475, at *8 (Tenn. Ct. App. 205) (quoting <u>McClellan v. McClellan</u>, 873 S.W.2d 350, 351–52 (Tenn. Ct. App. 1993))) (emphasis added). "Improper threats include those of crimes or torts, prosecution, bad faith use of civil litigation, or breach of the duty of good faith in contracting." Id. (citing Restatement (Second) of Contracts § 176 (Am. Law Inst. 1981) (updated June 2021)). Dr. Geng's affidavit states that her then-attorney "called [her] three more times" the same day she emailed her the Term Sheet "telling [her she] must sign the agreement" and "[o]n the last call [] told [her she] must sign the agreement that day." (Geng Decl., ECF No. 70-1 ¶ 5.) The pressure to sign the Term Sheet that Dr. Geng describes is not nearly sufficient to "overcome the mind and will of a person of ordinary firmness." <u>Nelson</u>, 2021 WL 4714663, at *4 (citations omitted). Further, the "general rule of Tennessee contract law is that 'a party to a contract cannot be relieved on account of the fraud of [or duress caused by] a third person in procuring the execution of such contract, that person not being an agent of nor acting in collusion with the opposite party.'" Id. (quoting <u>Columbian Mut. Life Ins. Co. v. Martin</u>, 136 S.W.2d 52, 55 (Tenn. 1940) (further citation omitted); also citing 21 Tenn. Prac. Contract Law and Practice § 6:4. Duress — Means of Perpetration (Aug. 2020)). Plaintiff makes no claim that her former counsel colluded with Defendant in procuring her signature on the Term Sheet. Thus, the pressure that Plaintiff alleges is not severe enough to amount to duress, and even if it were, duress could not originate from Plaintiff's own counsel under the circumstances. The latter point also defeats any claim of fraud by Plaintiff's former counsel as a defense to enforcement of the settlement.

Instead of explicitly invoking fraud or duress, however, Plaintiff states that, upon reading paragraphs 9 and 10 of the Agreement, she "realized that [she] had not 'had an adequate opportunity to consider' [the Term Sheet] and did not understand its terms before [she] signed it," and thus that her signing of the Term Sheet "was not a 'voluntary execution'" within the meaning of paragraph 10. (Geng Decl., ECF No. 70-1 ¶ 10; see also ECF No. 70 at PageID 230–31.) She further contends that she followed the language in paragraph 10 that advised her to consult with an attorney of her choice before signing, and that "[w]hen she was advised by [said attorney, i.e., Mr. Norwood] that the language of the Agreement would release not just her discrimination claims, as she believed, but her other claims as well, she refused to sign it" and notified her then-counsel as such. (ECF No. 70 at PageID 231.) Therefore, she contends that she "exercised the right [] Defendant gave her in [paragraph 10 of the] Agreement to not sign it" and that the Court should "nullify or revoke her signing of the [Term Sheet]." (Id. at PageID 233.) Defendant replies that Plaintiff "attempts to argue that her execution of the [Term Sheet] was not voluntary simply because she changed her mind about the settlement terms after she was provided a copy of the final [Agreement]." (ECF No. 71 at PageID 249.) Defendant continues, "However, her change of heart does not negate the fact that there was an agreement on all material terms at the time Plaintiff executed the [Term Sheet]."[3] (Id.) (citing Ullmann v.

---

[3] Defendant also challenges the "highly suspect" timing of Plaintiff's allegation regarding the forgery of her signature, as "Plaintiff has never raised this argument previously, and it is not pled in her Complaint or anywhere else in her lawsuit." (Id. at PageID 250.) At the Motion Hearing, Plaintiff asserted that her argument regarding the forged-signature claim was not untimely because she only discovered the forged signature when she received discovery in this case. (ECF No. 75.) Defendant responded that Plaintiff became aware of this other claim during the litigation, before signing the Term Sheet, knew how to ask for changes (such as the mutual non-disparagement clause), yet did not ask for this carve out. (Id.) The Court is convinced that Plaintiff knew of this claim early in the litigation and could have raised it earlier than she did. However, regardless of the timing of Plaintiff's mentioning her forgery-based retaliation claim, the settlement shall be enforced for the other reasons discussed in this Order.

Olwine, Connelly, Chase, O'Donnell & Weyher, 857 F.2d 1475 (Table), 1988 WL 92416 (6th Cir. 1988).)

Plaintiff made objective assent to the Term Sheet when she signed it after reviewing it and requesting changes, as discussed above, and she cannot negate her assent by claiming at the end of the twenty-one-day review period that she did not understand its (unambiguous) terms. The language of paragraphs 9 and 10 specifically relates to the release of ADEA/OWBPA claims, and whether Plaintiff's assent to the Term Sheet comported with paragraphs 9 and 10 of the Agreement is irrelevant to whether it was voluntary for the purposes of non-ADEA claims. See, e.g., Chaplin v. NationsCredit Corp., 307 F.3d 368, 376 (5th Cir. 2002) ("If *Oubre* extends beyond OWBPA and ADEA claims—and we strongly doubt it does—it extends only to federal statutes with an equally comprehensive regulation of releases."). For such claims, contract law governs, as discussed above. See, e.g., id. "Plaintiff knowingly signed the agreement, [here, the Term Sheet,] under no allegation of duress or inability to read the settlement agreements prior to her signature and agreement." Lovell v. Children's Corner Daycare, No. 1:17-cv-01039-JDT-egb, 2018 WL 1476096, at *2 (W.D. Tenn. Jan. 23, 2018). Because she objectively assented to the material terms of the settlement and cannot make out a recognized contract defense to its formation or enforcement, the Court will enforce the settlement, excepting the release of ADEA/OWBPA claims.

  iv. It Is Equitable to Enforce the Settlement

Finally, in response to Defendant's cited case law which states that settlements should be enforced "whenever it is equitable to do so," see, e.g., Graley, 2000 WL 799779 at *4, Plaintiff contends that enforcing this settlement would not be equitable, given "that she did not have adequate time to consider it, to understand its terms, or to voluntarily assent to all its terms

16

and conditions . . . ." (ECF No. 70 at PageID 233–34.)  For the reasons discussed above, the Court cannot accept Plaintiff's characterization of the facts.  Furthermore, Defendant's reliance on the settlement further tilts the equities toward enforcement.  In particular, Defendant asserts that, as the Parties were preparing for depositions to begin, "Ms. Johnson[] again began to aggressively pursue settlement.  UCH was not seeking any settlement at that time, as it was focused on the depositions, but it agreed to participate in settlement negotiations due to Ms. Johnson's persistence." (ECF No. 68 at PageID 209.)  Defendant asserts that, "because a settlement meant that the depositions that had been planned and prepared for would not go forward," on September 7, 2021, the same day that Ms. Johnson accepted the final settlement offer on Plaintiff's behalf, Defense counsel "drafted a Binding Settlement Term Sheet confirming the agreement and reflecting the agreed to settlement terms." (Id.) (citing Dowdy Decl., ECF No. 68-1 ¶ 8.)  Because Defendant cancelled depositions and, as it stated at the Motion Hearing, incurred other costs as a result of its reliance on the settlement, and because Plaintiff has failed to demonstrate otherwise, the Court finds that enforcing the settlement is equitable under the circumstances.

    B.   *The Court Declines to Award Attorney Fees and Expenses to Defendant*

Defendant additionally "requests that the Court award Defendant its reasonable attorneys' fees and expenses incurred in enforcing this settlement." (ECF No. 68 at PageID 214.)  Plaintiff does not respond to Defendant's assertion that, should the Court grant Defendant's Motion, Defendant is also entitled to attorney fees and expenses. (See generally ECF No. 70.)  Ordinarily, a party forfeits "issues not raised in response to [a] dispositive motion[]." Swanigan v. FCA US LLC, 938 F.3d 779, 786 (6th Cir. 2019) (citing Am. Copper

& Brass, Inc. v. Lake City Indus. Prods., Inc., 757 F.3d 540, 545 (6th Cir. 2014)).  The Court, however, proceeds to consider the merits of Defendant's request for attorney fees and expenses.

A court may award attorney fees under its inherent powers if it finds that "an attorney 'willfully-abuse[d] judicial processes by conduct 'tantamount to bad faith.'"  Jaynes v. Austin, 20 F. App'x 421, 427 (6th Cir. 2001) (citation omitted).  Additionally, a court has statutory authority to award attorney fees, costs, or expenses "reasonably incurred by such conduct," where an attorney "so multiplies the proceedings in any case unreasonably and vexatiously."  28 U.S.C. § 1927.  "[S]anctions under 28 U.S.C. § 1927 'require a showing of something less than subjective bad faith, but something more than negligence or incompetence."  Knopf v. Elite Moving Sys., 677 F. App'x 252, 257 (6th Cir. 2017) (citations omitted).  See also id. at 254–57 (affirming district court's award of monetary sanctions under 28 U.S.C. § 1927 for failing to respond, over the course of several months, to emails regarding finalizing previously agreed upon settlement and motion to compel settlement).

Defendant cites only Knopf and Ullmann, which both relied on 28 U.S.C. § 1927 to award sanctions.  See Knopf, 677 F. App'x at 256; Ullmann, 1988 WL 92416 at *4.  The Court therefore considers only whether an award of sanctions is proper under that statute.  In Knopf, the Sixth Circuit affirmed the imposition of sanctions under § 1927 where the plaintiff's attorney "failed to respond to several e-mails [regarding finalizing the parties' settlement] in December and also failed to respond to [the defendant's] Motion to Compel Settlement in February," "blaming 'personal issues,' 'out of town trips,' and a 'vacation in Florida' for his delay"; "did nothing for four months" after receiving no response to an email he allegedly sent to the defense asking for a change to the settlement terms, and then asked for a change in the terms after the court had already granted the Motion to Compel and sanctioned him; and had

18

created "previous delays [that] had stalled the adoption of a discovery plan[] and later forced [the defendant] to move to compel [the plaintiff] to answer its interrogatories." 677 F. App'x at 255–56. Meanwhile, in Ullmann, the magistrate judge sanctioned the plaintiff[4] for repudiating a settlement to which she had already agreed in open court, based on a newly asserted defense of duress. 123 F.R.D. 559, 562 (S.D. Ohio 1987), *aff'd* 1988 WL 92416. The magistrate judge additionally stated, "The facts will bear the interpretation that [the plaintiff] attempted to rescue herself from a desperate trial situation by pretending to settle with every intention of repudiating later and again attempting to obtain money from [the] [d]efendants." Id. at 563.

The behavior of Plaintiff's former and current counsel does not warrant sanctions. Plaintiff's original counsel withdrew because they disagreed with Plaintiff's opposition to the settlement. (ECF No. 76-1.) It thus cannot be said that Plaintiff's initial counsel "multiplie[d] the proceedings . . . unreasonably and vexatiously" or otherwise acted in bad faith to delay settlement. 28 U.S.C. § 1927. Meanwhile, Plaintiff's current counsel has merely advocated for Plaintiff in her attempt to avoid enforcement of the settlement. There is no accusation that he has been unresponsive to Defendant's communications or filings as in Knopf, nor that he feigned settlement with the intent to later extort Defendant, as in Ullmann. His litigation conduct since being brought onto the case hardly constitutes "multipl[ying] the proceedings . . . unreasonably and vexatiously." 28 U.S.C. § 1927. The Court therefore declines to award attorney fees and expenses to Defendant.

IV.    CONCLUSION

---

[4] Although "§ 1927 authorizes the sanctioning only of attorneys" and does not ordinarily authorize the sanctioning of a party herself, the magistrate judge in Ullmann "conclude[d] that [the plaintiff] [could] be held personally liable under § 1927" because she was an attorney barred in that court and had been representing herself in the case. 123 F.R.D. 559, 561 (S.D. Ohio 1987).

For each of the reasons set forth above, Defendant's Motion to Enforce Settlement is **GRANTED** with respect to all settlement provisions except release of ADEA claims, and Defendant's request for attorney fees and expenses is **DENIED**.

**SO ORDERED**, this 26th day of January 2022.

                                                                        /s/ Jon P. McCalla
                                                                        JON P. McCALLA
                                                                        UNITED STATES DISTRICT JUDGE